UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GREGORY N.,                                    :
                                               :
    *Plaintiff*,                             :
                                               :
        v.                              :        No. 3:23-cv-761 (MPS)
                                               :
KILOLO KIJAKAZI,                               :
                                               :
    *Defendant*.                             :

## <u>RECOMMENDED RULING</u>

    Plaintiff brings this administrative appeal from the decision of the Commissioner of the Social Security Administration denying his application for disability insurance benefits. For the reasons below, the undersigned recommends that plaintiff's Motion to Reverse the Decision of the Commissioner, ECF 14, be DENIED, and the Commissioner's Motion to Affirm, ECF 17, be GRANTED.

### A. LEGAL STANDARDS

#### 1. Disability and eligibility

    A claimant is disabled under the Social Security Act if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To be eligible for Title II disability insurance benefits, the claimant must establish the onset of disability during the period in which he or she was insured based on quarters of qualifying work. 42 U.S.C. § 423; *see also Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989).

### 2. Commissioner's five-step review

The Commissioner of Social Security is authorized to make findings of fact and decide disability applications, *see* 42 U.S.C. § 405(b)(1), in accordance with the five-step sequential evaluation process provided in 20 C.F.R. § 404.1520. (1) First, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. (2) If not, the Commissioner determines whether the claimant has a medically determinable impairment or combination of impairments that are "severe," meaning that it "significantly limits" the claimant's physical or mental ability to do basic work activities. (3) If the claimant has a severe impairment or combination of impairments, the Commissioner evaluates whether, based solely on the medical evidence, the claimant has an impairment that "meets or equals" an impairment listed in Appendix 1, Subpart P, No. 4 of the regulations (the "Listings") and that either is expected to result in death or has lasted or will last for at least 12 months. [1] If so, the claimant is disabled. (4) If not, the Commissioner determines whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his or her past work. [2] (5) If not, the Commissioner determines whether there is other work in the national economy which the claimant can perform in light of his or her RFC, age, education, and work experience. *See* 20 C.F.R. § 404.1520. The claimant bears the burden of proof on the first four steps, and the Commissioner bears the burden of proof on the final step. *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014).

---

[1] *See* 20 C.F.R. § 404.1509 (durational requirement).

[2] Residual functional capacity is the most a claimant can do in a work setting despite his or her limitations. 20 C.F.R. § 404.1545.

The Commissioner's authority to make these findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. § 404.929. A claimant may request review of an ALJ's decision by the Appeals Council. *See* 20 C.F.R. § 404.967. If the Appeals Council declines review or affirms the ALJ's decision, the claimant may appeal to the United States District Court. 42 U.S.C. § 405(g).

### 3. Court's review on appeal

A district court reviewing the Commissioner's final decision is performing an appellate function, *see Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981), and has the power to affirm, modify, or reverse the Commissioner's decision based on its review of the briefs and the administrative record. *See* 42 U.S.C. § 405(g). "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

## B. BACKGROUND

### 1. Procedural History

In November 2020, plaintiff filed an application for disability insurance benefits alleging a disability onset date of December 31, 2019. R. 203-09. The claim was denied at the initial review and reconsideration levels, and plaintiff requested a hearing. R. 96-105, 106-117. On December 23, 2021, ALJ I.K. Harrington conducted a telephonic hearing at which plaintiff and a vocational expert testified. R. 55-94. On March 16, 2022, the ALJ issued a written decision denying plaintiff's claim. R. 37-49. Plaintiff's request for review was denied by the Appeals Council, R. 1-5, and plaintiff filed this action on June 13, 2023.

### 2.  Work history

Plaintiff was 55 years old at the alleged disability onset date of December 31, 2019.  He

has a bachelor's degree in finance.  R. 87.  His past relevant work includes financial data entry,

car salesman, and waiter.  R. 80-87.

### 3.  List of impairments

In her March 2022 Decision, the ALJ found that plaintiff had both severe impairments

(degenerative disc disease, ankylosing spondylitis, osteoarthritis, inflammatory arthritis, obesity)

and non-severe impairments (hypertension, left and right carpal tunnel release, mild primary

open angle glaucoma of both eyes and uveitis in the left eye, and depression). [3]  R. 19-20.

### 4.  Physical conditions and treatment

#### a.  Overview of physical conditions

Plaintiff's primary diagnosis is ankylosing spondylitis ("AS"), which was first diagnosed

around 2006 or 2010.  R. 616, 1004.  As described by the National Institutes of Health,

> Ankylosing spondylitis is a type of arthritis that causes inflammation in certain
> parts of the spine.  It may also affect the knees, ankles, and hips.  This
> inflammation in the joints and tissues of the spine can cause stiffness.  In severe
> cases, this may cause the bones in the spine to grow together, which can lead to a
> rigid spine that is difficult to bend.

*See* NIH: NATIONAL INSTITUTE OF ARTHRITIS AND MUSCULOSKELETAL AND SKIN DISEASES,

https://www.niams.nih.gov/health-topics/ankylosing-spondylitis/basics/symptoms-causes (last

visited May 1, 2024).  Additionally, he underwent lumbar fusion and cervical fusions in his

twenties, as seen in x-rays at L5-S1 and C5-6.  R. 310, 435.  Plaintiff has received treatment for

---

[3] Although the medical records mention a diagnosis of generalized anxiety disorder dated
3/19/2015, R. 294, and plaintiff was taking Xanax and buspirone in 2017 and 2018, R. 650, his
mental health treaters did not diagnose an anxiety disorder, and plaintiff does not assert in his
brief that the ALJ should have identified anxiety as an impairment.

pain and stiffness in multiple areas of his body, including in his lumbar region, bilateral hips, bilateral shoulders and right knee. In November 2019, a pulmonary function test showed reduced lung volumes "likely related to his skeletal limitations," R. 1775-76, but a comparison study in November 2020 showed "very mildly reduced" vital capacity and functional residual lung capacity with improved lung volumes, R. 401. Plaintiff had bilateral carpal tunnel releases in 2020 and multiple trigger finger procedures on his left hand in 2021. R. 740-41, 751, 769, 1320, 1322. He also has had issues with his eyes, including glaucoma, an episode of right eye uveitis in October 2016, and cataract surgery in December 2020. R. 840, 1384, 1018.

### b. Treatment with rheumatologist, neurologist, physiatrist, and orthopedist

In October 2016, plaintiff's PCP referred him to rheumatologist Oana Zaha, M.D. for evaluation of AS. Plaintiff reported constant 5/10 whole spine pain, worse with rest and better with movement, especially stretching, and thought his symptoms were progressively getting worse. R. 577. Dr. Zaha observed decreased cervical, thoracic, and lumbosacral range of motion. R. 579-80. Later that month, she prescribed Humira with daily stretching and weight-bearing aerobic exercise as tolerated. R. 582. In November 2016, he reported no improvement with Humira, and Dr. Zaha prescribed Cimzia. R. 585-86. In July 2017, plaintiff reported that his neck and low back pain were the same as before Cimzia. R. 586. In July 2018, he reported decreased mobility and pain when trying to play golf or exercise and thought he could no longer wait tables. R. 589. Dr. Zaha noted an x-ray showed stable changes of AS compared to a May 2016 x-ray. R. 618.

In November 2018, plaintiff consulted with neurologist Paul Lleva, M.D. regarding intermittent bilateral lower extremity spasms. R. 592. Dr. Lleva prescribed Flexeril and a lumbar MRI. R. 595. The MRI showed degenerative changes predominantly along the L5 nerve

root and found the lower extremity parasthesias to be suggestive of lumbosacral radiculopathy at L5-S1.  R. 596, 599.  Dr. Lleva continued the Flexeril, started gabapentin and physical therapy for lumber exercise, and referred plaintiff to physiatrist Leigh Hanke, M.D.  R. 600.

In December 2018, plaintiff consulted with Dr. Hanke, who recommended physical therapy focused on core strength and an epidural steroid injection.  R. 604.  The injection resolved the leg pain but only partly improved his back pain.  R. 606.  In February 2019 plaintiff complained of acute right knee pain.  An x-ray showed a mild effusion, and Dr. Hanke administered a steroid injection.  R. 606, 609-10.  Later that month, plaintiff reported that he had discontinued gabapentin but continued taking Flexeril.  R. 615.

In October 2019, plaintiff had a checkup with rheumatologist Dr. Zaha who made no changes in his treatment.  R. 619.  On December 9, 2019 (three weeks before his alleged onset date), plaintiff reported to Dr. Zaha that his condition was stable apart from a few minutes of morning stiffness and decreased neck range of motion, with no joint pain, though he reported that his lung restriction had worsened.  R. 621.

In May 2020, plaintiff underwent a left trigger thumb release and left open carpal tunnel release procedure with orthopedist Matthew Cantlon, M.D., which was successful in relieving pain, but then needed a follow-up left index trigger finger procedure in November 2020.  R. 740-41, 751, 759.  That same day he underwent right open carpal tunnel release with good results.  R. 759, 769.

In July 2020, plaintiff told Dr. Zaha that he was doing well, without worsening baseline spinal pain and unchanged range of motion except a slightly stiffer neck.  R. 625.  In September 2020, plaintiff complained to Dr. Hanke of new right hip pain, 6 out of 10, mainly clicking and electrical.  R. 629.  He reported that walking made it worse, but he continued lifting weights and

stretching. R. 635.  An x-ray of his right hip showed degenerative changes at the lateral margins of the hip joints, consistent with AS.  R. 638.  A right hip injection provided 40% improvement, followed by a left hip injection in October 2020 with good results.  R. 635, 641.  At that time, plaintiff reported an ache in the inner portion of his right knee after lifting weights in the gym, especially when walking up and down the stairs or getting in and out of the car.  R. 641. The plaintiff then received a three-series injection for his right knee, the first injection at the end of October 2020 and the last in early November 2020.  R. 645, 647- 48.  In November 2020, the plaintiff reported right shoulder pain for two months, worse with overhead movements and lifting, sometimes 8/10, but he continued to do exercises at home.  R. 1576.

In March 2021, Dr. Zaha noted that plaintiff's spinal condition was stable, R. 1018, and continued his regimen of Cimzia and daily stretching with weight bearing, aerobic exercise as tolerated.  R. 1021.

In March 2021, plaintiff reported bilateral hip pain to Dr. Hanke, this time with radicular symptoms, noting that injections were more effective than Flexeril.  R. 1584.  In May 2021, Dr. Hanke performed a left S1 injection.  In June 2021, plaintiff reported improvement since the injection but also reported new recurring right hip pain with walking and stretching and occasional sharp pain in his shoulder when trying to bench press 20 pounds, and he asked for injection options.  R. 1599.  He received a left shoulder injection and reported significant improvement in July 2021.  R. 1615-16.  Dr. Hanke recommended physical therapy for the shoulder, R. 1620, and performed a sacroiliac joint injection for right hip pain in August 2021, R. 1622.

In August 2021, plaintiff followed up with neurologist Dr. Lleva, who continued the gabapentin and Flexeril prescriptions and also recommended physical therapy, which plaintiff declined.  R. 1301.

In July and October 2021, Dr. Cantlon administered injections to treat two trigger fingers on plaintiff's left hand.  R. 1320, 1322.  Plaintiff then reported to the ALJ that he had surgery on those fingers two weeks before the December 2021 hearing.  R. 64.

### 5. Mental health treatment

In December 2016, the plaintiff began seeing psychiatrist Christine Naungayan, M.D. who diagnosed him with unspecified mood disorder and insomnia.  R. 651.  She saw plaintiff approximately every 1-2 months, *id.*, and the last visit in the record was on February 19, 2021, R. 975-76.  Plaintiff also treated with psychologist Lisa Sullivan, Ph.D., usually multiple times per month from September 2018 through March 2021 and from August through September 2021. R. 552-76, 870-961, 1313-19.  Dr. Sullivan diagnosed him with major depressive disorder, recurrent severe without psychotic features.  *See*, *e.g.*, R. 961.

During that treatment, coping with depression was the main focus, R. 930-940, and plaintiff often presented with an anxious mood, both alone, R. 561, and in combination with depression or anger, R. 928-933, 936.  Dr. Naungayan summarized in December 2020 that plaintiff "also has anxiety, largely in the context of affective dysregulation and ongoing contextual stressors."  R. 651.  Plaintiff frequently ruminated about legal trouble that occurred a few years prior, explaining that he felt "stuck" and wished he had a time machine to change the past.  R. 819, 835.  In a handful of sessions, Dr. Sullivan reported that the plaintiff's mood was improved.  R. 870, 876, 900, 914.  Notably, plaintiff experienced general improvement after the alleged disability onset date, reporting a stable mood most frequently from May to August 2020,

in December 2020, and in September 2021.  In those sessions, the plaintiff discussed his desire

and attempts to reframe his thinking, R. 875, get better, R. 571, move forward, R. 1318, and

focus on managing his depression, R. 908.

Although he consistently attended treatment sessions, plaintiff declined recommended

treatment modalities such as eye movement desensitization and reprocessing, cognitive

behavioral therapy, and electroconvulsive therapy, R. 798-99, and his compliance with

medication was inconsistent, such as self-discontinuing Depakote and Zyprexa, R. 651, 677-78,

680, 688, 690.  Dr. Naungayan summarized in December 2020 that plaintiff "has been stable in

general for the past 4 years on a regimen of Remeron and Seroquel."  R. 651.

Contemporaneously, plaintiff reported decrease in anxiety and anger due to his blood pressure

medication.  R. 952, 955.  In February 2021, he confirmed that progress to Dr. Naungayan,

describing his anxiety as "markedly improved" with his hypertension medications.  R. 975.  As

for his overall demeanor, Dr. Naungayan summarized that the plaintiff was "always cooperative

and pleasant in his sessions, even when frustrated or upset[.]"  R. 652.

### 6.  Plaintiff's statements

Plaintiff completed a Function Report form in December 2020 to support his application.

He wrote that he had difficulty reaching his feet in the shower and when putting on socks and

shoes.  R. 244.  He cooked daily, made the beds, did laundry, washed dishes, went grocery

shopping, mowed the lawn, and did minor household repairs. R. 244-45.  He also paid bills,

handled a checkbook and a savings account and was able to follow written instructions.  R. 246,

248.  His hobbies and interests included reading, television/movies, internet, going to the beach,

golfing, and exercising for therapy.  R. 247.  Some of these he did socially on a regular basis,

although he wrote that anxiety, frustration, and depression all impaired his ability to interact with

others, and he could golf only 5-10 times per year due to physical limitations.  *Id.*  He liked to

drive and he could walk a mile without needing a break.  R. 247-48.  Plaintiff also wrote that

anxiety affected his sleep and made it difficult to handle his stress.  R. 244, 249.

At the December 2021 administrative hearing, plaintiff testified that, on average, his

daily pain level was 6 out of 10.  R. 68.  Standing or sitting for more than half an hour caused his

legs to cramp, so he needed to move frequently.  R. 69-70.  He stated: "The less you move, the

more that the [ankylosing spondylitis] spreads."  R. 70.  He could also walk half a mile to a mile,

including to the beach near his house, but had to stretch after a mile to avoid cramps.  R. 70-71.

Each day he spent 15 minutes stretching his legs and 45 minutes to an hour stretching his whole

body, especially his hamstrings, calves, and thighs to prevent spasms.  R. 71-72.  Plaintiff

testified that he could not bend or swing a golf club.  R. 74.

### C.  THE ALJ'S DECISION

In her March 2022 decision, the ALJ found that plaintiff had the severe and non-severe

impairments listed above and that the impairments did not meet or medically equal a listed

impairment.  R. 21.  She then found that plaintiff had the residual capacity to perform light work

as defined in 20 C.F.R. 404.1567(b) except with the following limitations: no more than frequent

kneeling, crouching, and climbing of ramps and stairs; no more than occasional balancing,

stooping, and crawling; never climb ladders, ropes and scaffolds; avoid concentrated exposure to

wetness and vibrations; and avoid even moderate exposure to hazards, dangerous moving

machinery, and unprotected heights.  R. 21-22.  At Step 4, the ALJ found that the plaintiff was

capable of performing past relevant work as a Data Processing Clerk, Waiter, or Customer

Service Representative and, therefore, that he was not disabled within the meaning of the Social

Security Act since the alleged December 2019 onset date.  R. 26-28.

## D.  DISCUSSION

Plaintiff's statement of the issues, *see* ECF 14-1 at 2, is vague and does not correspond

with the arguments in his brief.  His overarching contention is that his RFC should have included

more exertional limitations and should have been adjusted to account for off-task behavior and

social and stress-related limitations caused by his pain, movement difficulties, and mental health

situation.  *See id.* at 33-36.  Underlying this assertion are three specific claims of error: (1) the

ALJ should have found severe mental health impairments at Step 2, *id.* at 36; (2) the ALJ

incorrectly concluded that plaintiff's symptoms, including pain, were not as limiting as he

alleged, *id.* at 27-32, 36-37; and (3) the ALJ incorrectly found the opinion of the consultative

examiner to be minimally persuasive, *id.* at 33-38.  However, the undersigned finds no reversible

error.

### 1.  Severity of mental health impairments

Plaintiff contends in cursory fashion that the ALJ should have found severe mental health

impairments "in light of the long and consistent mental health record, indicating severe major

depression (Tr. 552) and ongoing anger and anxiety issues (Tr. 568, 571, 927), despite

counseling and medication management (Tr. 652)."  ECF 14-1 at 36.  At Step 2, the ALJ found

that plaintiff's medically determinable mental impairment of depression was non-severe because

it did not cause more than minimal limitation in his ability to perform basic work activities.  R.

20.  Although plaintiff's brief argues that the ALJ simply relied on the agency reviewers in

reaching this conclusion (ECF 14-1 at 36), that is incorrect: while the ALJ did find the opinions

of the agency reviewers persuasive on this issue, her reliance on those opinions was

supplemental to her thorough analysis of the limiting effects of plaintiff's mental health impairment under the paragraph B criteria as required by 20 C.F.R. § 404.1520a.[4]  *See* R. 20-21.

    For instance, with respect to understanding, remembering and applying information, the ALJ noted that the plaintiff's mental health treatment records referenced normal cognition, judgment and reasoning in multiple mental status examinations in 2021, well after the alleged onset date.  R. 20; *see also* R. 975, 1517, 1528, 1542, 1556, 1587 and 1618.  Plaintiff also self-reported that he did not need any reminders to take medications, was able to pay bills, and handle his bank accounts.  R. 245-246.  As for his ability to interact with others, while the medical record suggests that plaintiff often presented as irritable, angry or with an anxious mood, his treating psychologist, Dr. Sullivan, also remarked on multiple occasions that his mood was improved and, in December 2020, his treating psychiatrist, Dr. Naungayan, observed that plaintiff's mood had been stable on psychiatric medications over the prior four years.  Plaintiff himself affirmed in February 2021 that his anxiety had "markedly improved" with his medications.  R. 651, 870, 876, 900, 914, 975.  As for his abilities to concentrate, persist and maintain pace and to manage himself, plaintiff performed a wide variety of activities of daily living, including attending to his personal hygiene and engaging in a multitude of household tasks, and reported that he was able to follow written instructions.  R. 244-248.  In short, the medical record as a whole contains substantial evidence to support the ALJ's analysis and conclusion that plaintiff's mental impairments caused no more than a mild limitation in any

---

[4] In order to meet the paragraph B criteria, a claimant must have an extreme limitation, or two marked limitations, in: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself.  *See* Appendix 1 to 20 C.F.R. Part 404, Subpart P §§ 12.04 and 12.06.

functional areas and that he did not have more than a minimal limitation in his ability to do basic work activities.

      Plaintiff does not allege any legal or factual deficiency in the ALJ's paragraph B discussion, nor has the undersigned found any such deficiency on review.  Indeed, the ALJ's paragraph B findings are consistent with plaintiff's December 2020 function report where, although he indicated he experienced anxiety and depression and states his physical health affects his mental health, R. 247, 249, he did not identify any specific mental impairment that directly affected his functional abilities.  R. 248.  Similarly, in his hearing testimony, when asked what has stopped him from being able to work full time since December 2019, plaintiff identified only physical impairments and did not specify any limitations stemming from mental health conditions.  R. 68.

      Furthermore, although the ALJ's decision did not expressly analyze whether anxiety was a medically determinable impairment, the ALJ took into account that plaintiff "often presented with an irritable, angry or anxious mood" in the mental health treatment notes.  R. 20.  This discussion of anxiety as a symptom rather than a freestanding impairment is consistent with the approach taken by mental health treaters.  Psychiatrist Dr. Naungayan found that plaintiff "meets criteria for the medical diagnoses of" unspecified mood disorder and insomnia only.  R. 651. She then noted that he "also has anxiety" but "largely in the context of affective dysregulation and ongoing contextual stressors."  *Id.*  Separately, psychologist Dr. Sullivan diagnosed major depressive disorder, recurrent severe without psychotic features, with no separate diagnosis relating to anger or anxiety.  R. 961.  Consequently, the ALJ did not err in finding depression to be plaintiff's sole mental health impairment or in finding it to be non-severe.

## 2. Evaluation of pain and other symptoms

Plaintiff next claims that the ALJ cherry-picked evidence to support her conclusion that plaintiff's "symptoms do not limit his activities to the extent alleged."  R. 25.  The procedure for evaluating a claimant's statements regarding his symptoms is provided in 20 C.F.R. § 404.1529 and further explained in SSR 16-3p.  "Symptoms" means the claimant's "own description of [his] physical or mental impairment," 20 C.F.R. § 404.1502(i), and the ALJ's task is to determine "the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."  20 C.F.R. § 404.1529.

This evaluation involves two steps.  *First*, the ALJ evaluates whether there is an underlying medically determinable impairment that could reasonably be expected to produce the reported symptom – such as pain, for example – irrespective of its alleged severity.  *Id.* Objective evidence is required at this step, i.e., medical "signs" established by medically acceptable clinical diagnostic techniques or laboratory findings shown by laboratory diagnostic techniques.  *Id.  Second*, if objective evidence reveals an impairment that could cause the alleged symptoms, the ALJ evaluates their intensity and persistence and the extent to which they limit the ability to perform work-related activities.  *Id.*  In this step, the ALJ considers not only objective medical evidence but also other evidence such as the claimant's own statements, evidence submitted by medical sources including medical opinions, and observations by other persons including prior administrative medical findings by agency consultants.  *Id.*  Additionally, the ALJ considers any of the following factors that are relevant to a particular case: (i) daily activities; (ii) location, duration, frequency, and intensity of pain or other symptoms; (iii) precipitating and aggravating factors; (iv) type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (v) treatment, other than medication,

received for relief of pain or other symptoms; (vi) measures used to relieve pain or other symptoms; and (vii) other factors concerning functional limitations and restrictions due to pain or other symptoms.  *Id.*  The ALJ then must "explain which of an individual's symptoms we found consistent or inconsistent with the evidence in his or her record and how our evaluation of the individual's symptoms led to our conclusions."  *See* SSR 16-3p.

Here, the ALJ found that the first step was satisfied insofar as plaintiff's impairments could reasonably be expected to cause his alleged symptoms of pain, leg cramping, breathing restriction, need to shift positions, difficulty reaching below his knees, worry, irritability, and moodiness.  R. 22-23.  However, the ALJ found inconsistency between plaintiff's statements and other evidence concerning the intensity, persistence, and limiting effects of these symptoms.  R. 23-36.  The decision goes on to recount plaintiff's treatment with rheumatologist Dr. Zaha who found his condition to be stable from 2016 to 2021 and prescribed effective medication and daily exercise (R. 23-24); testing showing only mild breathing restriction (R. 24); pain management treatment with Dr. Hanke involving effective medications and injections in his back, shoulders, knees, and hips (R. 24-25); and carpal tunnel surgery and finger injections (R. 19).  The ALJ also discussed plaintiff's own reports of his daily activities, which included daily physical activity and household chores (R. 25).  The ALJ further noted that plaintiff was still working as a waiter in 2020 after his alleged December 2019 onset date. [5]  R. 19.

---

[5] The ALJ cites a September 2020 treatment note indicating that plaintiff was working full-time as a waiter.  *See* R. 19.  Although that sentence could be an outdated artifact from plaintiff's initial consult with Dr. Hanke in December 2018 (R. 601), given that it continued to appear without change in subsequent treatment notes through July 2021 (R. 1616), plaintiff expressly testified at the hearing that "from 2015 to 2020, I was a waiter" (R. 87) so the ALJ's observation appears to be accurate.

Plaintiff does not dispute the ALJ's conclusion that treatment interventions were effective but argues that "the ALJ cherry-picked treatment notes that showed short-lived improvement of isolated body parts, and ignored the longitudinal record that showed the toll that this degenerative and incurable illness has taken on [plaintiff's] back, hips, knees, neck, shoulders, and arms." ECF 14-1 at 32. He further argues that the ALJ "did not understand the nature of [plaintiff's] condition and the pain that it causes." R. 36. However, that criticism is baseless. This is not a case in which an ALJ "dismiss[ed] . . . symptoms as intermittent without evaluating how the symptoms affect functional limitations," *cf. Mead v. Colvin*, No. 3:15-cv-1331 (AWT), 2017 WL 1134393, at *1 (D. Conn. Mar. 27, 2017) (ALJ improperly concluded that intermittent symptoms undermined plaintiff's credibility where intermittent symptoms were a characteristic of her lupus disease), or in which the ALJ "appears to have misunderstood the nature of the plaintiff's condition," *id.* (citing *Green-Younger v. Barnhart*, 335 F.3d 99 (2d Cir. 2003)). Here, an objective reading of the decision shows that the ALJ accurately recognized the degenerative nature of ankylosing spondylitis and its features of pain and stiffness, recited plaintiff's diligent and ongoing efforts to obtain relief, and observed the extent to which medications, injections, surgeries, and daily exercise were effective in reducing plaintiff's pain and allowing him to remain fully independent and physically active despite his challenging symptoms.

Plaintiff also particularly objects that the ALJ relied too heavily on plaintiff's reported physical activities such as golfing and daily exercise, arguing that these activities are "not an indicator of [plaintiff's] physical ability, but of his desire to preserve as much of his spinal range of motion as he can." *Id.* at 31. However, regardless of whether plaintiff's physical activity was therapeutic versus recreational, it was pertinent to the question of whether his symptoms were as intense, persistent, and limiting as he alleged, and the ALJ properly accounted for it.

In sum, the fact that ankylosing spondylitis is degenerative and will increase plaintiff's limitations over time does not mean that it was disabling during the relevant period from the alleged onset in December 2019 to the ALJ's decision in March 2022.  The ALJ did not misunderstand plaintiff's medical conditions or cherry-pick or mischaracterize the evidence regarding his symptoms but, rather, noted the extent to which he had been able to obtain effective treatment and remain active despite his diagnosis.  Moreover, the existence of some evidence in plaintiff's favor does not answer the question of whether the ALJ's factual conclusions are supported by substantial evidence.  Because the ALJ's findings regarding the limiting effects of plaintiff's symptoms are supported by substantial evidence, reversal is not warranted despite plaintiff's belief that the weight of the evidence tipped in his favor.  *See Spottswood v. Kijakazi*, No. 23-54-CV, 2024 WL 89635, at *2 (2d Cir. Jan. 9, 2024) ("[O]nce an ALJ finds facts, we can reject those facts only if a reasonable factfinder would have to conclude otherwise.  . . . We are not to reweigh evidence and must uphold a determination when evidence is susceptible to more than one rational interpretation.") (citation and quotation marks omitted).

### 3.  Weight of medical opinions

Lastly, Plaintiff's challenges the ALJ's conclusion that the opinion of consultative examiner Joseph Guarnaccia, M.D. was only minimally persuasive as compared to the opinions of agency reviewers that the ALJ found to be persuasive.  ECF 14-1 at 35-38.

When weighing the persuasiveness of medical opinions and prior administrative medical findings[6] in the record, the ALJ must consider five factors: supportability, consistency, the

---

[6] The regulations define a medical opinion as "a statement from a medical source about what you can still do despite your impairment(s)[.]"  20 C.F.R. § 404.1513(a)(2).  A prior administrative medical finding means "a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review[.]"  *Id.* § 404.1513(a)(5).

medical source's relationship with the claimant, the length of the treatment relationship, the source's area of specialty, and any "other factors that tend to support or contradict a medical opinion." 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors. *Id.* § 404.1520c(b)(2). Supportability "has to do with the fit between the medical opinion offered by the source and the underlying evidence and explanations 'presented' by that source to support her opinion." *Rivera v. Comm'r of the Soc. Sec. Admin.*, No. 19-cv-4630 (LJL)(BCM), 2020 WL 8167136, at *16 (S.D.N.Y. Dec. 30, 2020). In contrast, consistency "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Vellone v. Saul*, No. 1:20-cv-261 (RAK)(HP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021). "The more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(2).

Plaintiff's central objection to the ALJ's conclusion that Dr. Guarnaccia's opinion was only minimally persuasive is that whereas the agency doctors merely reviewed the paper record, Dr. Guarnaccia actually performed an examination. Plaintiff cites an Eighth Circuit decision from 1983 and a Ninth Circuit decision from 1993 for the proposition that the opinions of doctors who merely review the papers have limited value. ECF 14-1 at 36. However, since 2017, the regulations do not presumptively favor one type of medical opinion over another; instead, every medical opinion is subject to the same five-factor review and stands on its own merits. *See* 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources."). Of course, "relationship with the claimant" is a factor that the ALJ must consider, and the regulations observe that "[a] medical

source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder." *Id.* § 404.1520c(c)(3)(v). But supportability and consistency remain the "most important" factors, such that they are only factors that the ALJ is required to explicitly explain in the decision. *Id.* § 404.1520c(b)(2).

Plaintiff's claim of error boils down to whether substantial evidence supports the ALJ's finding that Dr. Guarnaccia's opinion was only minimally persuasive. [7] The evidence that he cites in favor of the opinion are Dr. Guarnaccia's exam findings that plaintiff could not lay flat on the table because he could not extend his neck; that he had "some difficulty" with tandem gait; his spine flexion was 30 degrees; that his posterior cervical spine had flexion and extension of 10 degrees and lateral movements of 20 degrees, and that he indicated diffuse pain down his spine to his lower back. ECF 14-1 at 37, citing R. 1006-07. Dr. Guarnaccia's entire analysis was as follows:

> 57 year old man with ankylosing spondylitis with ongoing pain, restricted trunk and cervical/spine range of motion who would be limited in work related activities that require prolonged standing, bending, lifting, twisting, climbing, lifting and carrying. His mood disorder would probably make it difficult for him to perform in a variety of unfamiliar work related settings. [8]

R. 1007. To the extent that plaintiff is arguing that the opinion is well-supported, it is true that Dr. Guarnaccia cited empirical evidence from his examination. However, unlike the agency reviewers, Dr. Guarnaccia did not cite any medical evidence outside his own exam – in fact, it is unclear from his two-page opinion whether he even reviewed any of plaintiff's medical records.

---

[7] The Court need not address the ALJ's finding that the opinions of the agency reviewers were persuasive because plaintiff does not identify any deficiency in those opinions.

[8] Regarding mood, Dr. Guarnaccia described his interaction with plaintiff as follows: "He was somewhat short tempered and snapped frequently during the interview and exam. His answers to questions were frequently vague and dismissive." R. 1007.

So the ALJ's observation that this "was a one-time examination that was unsupported by the other treatment notes and evidence" is accurate.  R. 26.

      As the ALJ went on to illustrate with citations from the medical record, the opinion was also inconsistent with the medical evidence – showing symptom improvement with injection treatments and regular exercise including weightlifting and golf – and with plaintiff's own reported daily activities – including cooking, food shopping, making beds, laundry, washing dishes, mowing the lawn, minor household repairs, driving, golf, and exercising. [9]  *Id.*  Plaintiff objects that there is evidence of decreased range of motion and pain in the medical record consistent with Dr. Guarnaccia's opinion.  *See* ECF 14-1 at 36, citing R. 413, 420 (limited ROM in spine and hip with pain in September and October 2020), R. 435 (July 2018 cervical spine x-ray showing ankylosing and fusion of facet joints including post-fusion and decompression surgery), and R. 615 (plaintiff complained in October 2019 of decreased mobility and pain when playing golf or exercising).  However, the existence of some evidence favorable to plaintiff does not negate the existence of substantial evidence supporting the ALJ's finding, *see Spottswood*, 2024 WL 89635, at *2 (2d Cir. Jan. 9, 2024) (court cannot reweigh evidence "and must uphold a determination when evidence is susceptible to more than one rational interpretation"), and the record contains substantial medical evidence, as set forth above, that plaintiff was able to effectively manage his pain with medication, injections, and exercise and still maintain significantly more daily physical activity than Dr. Guarnaccia's opinion suggests.  Moreover, although the ALJ found Dr. Guarnaccia's opinion minimally persuasive, she did not ignore it, and adjusted the RFC to include additional limitations to the light work definition including no

---

[9] Regarding golf, plaintiff testified in December 2021 that he could no longer swing a golf club. R. 74.  However, in December 2020, twelve months after his alleged December 2019 onset date, he wrote in a Function Report that he played golf 5-10 times per year.  R. 247.

more than frequent kneeling, crouching, and climbing of ramps and stairs; no more than occasional balancing, stooping, and crawling; never climb ladders, ropes and scaffolds.  R. 21. In sum, the ALJ's findings concerning the opinion of consultative examiner Dr. Guarnaccia satisfy the substantial evidence standard.

### E.  CONCLUSION

For the foregoing reasons, the undersigned finds no error in the ALJ's determinations concerning the severity of plaintiff's mental health impairments, the limiting effects of subjective symptoms such as pain, and the weight assigned to the medical opinion of the consultative examiner.  The undersigned recommends that plaintiff's Motion to Reverse the Decision of the Commissioner, ECF 14, be DENIED, and the Commissioner's Motion to Affirm, ECF 17, be GRANTED.

Any party may seek the district court's review of this recommended ruling.  *See* Fed. R. Civ. P. 72(b)(2) (written objections to proposed findings and recommendations must be filed objections to recommended ruling due fourteen days after being served).  Failure to file timely objections will preclude appellate review.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 and 6(a); D. Conn. L. Civ. R. 72.2; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam); *F.D.I.C. v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED, this 23rd day of May, 2024, at Bridgeport, Connecticut.

*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge